Good morning. The first case for argument this morning is Kwesele v. King County. Mr. Parker, you may begin, although I'm sure you will correct me on the pronunciation. Also, are you able to link into the video so that you can see us? I am not. I don't have the capacity to do that where I am. All right, no problem. I will give you kind of a heads up then in terms of your rebuttal time. You have 15 minutes for argument. How much time would you like to save for rebuttal? Five minutes. All right, I will let you know when you approach that time. You may begin. Thank you, Your Honors. I may please the court. This is a case where the district court ruled that there were no material facts and issue as to whether John Kwesele was discriminated against because of his race. At the time, at the time I presented my written briefs, I was proceeding under the assumption that in a 1981 case, the standard was motivating factor and that issue has been decided by the United States Supreme Court so that it's no longer motivating factor as announced by the Ninth Circuit. But it's it's a but for a cause. But I think it doesn't make that much of a difference in this case, but that's not what was argued in the brief. So I just wanted to point that out. Well, maybe maybe you could then because that recent case from Comcast came down requiring you to plead and prove that that was a but for cause. Tell me then, do you believe that the evidence in the record satisfies a but for causation standard? I do. I do because because I think if it were not for Mr. Kwesele's race or ethnicity, he'd still be working for King County. It's just difficult because when I briefed the issue and I argued in written format, I was making this I was using the motivating factor language and that of course is not the language that we're going to be using. Are you still seeking to hold the defendants personally liable or are you intending to sue them solely in their official capacities? Both. Both? Is that what you allege? I believe so. All right, let's change to King County. You state in your complaint that King County is strictly liable for conduct. How does that square with Federation of African-American Contractors which held that the plaintiff must show that the injury resulted from either the official policy or custom? Well, I think what my argument is is that King County had no notice both by from Mr. Kwesele's complaints and by complaints from other employees that the environment, the work environment was infected by discrimination and they didn't take any action. But the problem is that if you're going to show that the injury resulted either from an official policy or custom that the municipality has and you didn't allege it and I don't find any evidence there that supports it. Well, I agree that we did not allege it, but I think the evidence is there because what is the policy? What is the evidence? What is the evidence then that you think could support that finding? Well, for one thing, we submitted declarations from Karen Rispoli and Frank King and from Claude Brown showing that on several occasions management was informed of racism. But just a minute, just a minute. That doesn't show an official policy or custom. It's a custom if you're aware of racism is existing and the period of time is from 2009 all the way up into 2014. If you're aware for a long period of time that racism is existing and you don't investigate and you don't do anything about it, that becomes the custom of the municipality. And that's your argument? That's my argument with respect to King County, yes. All right, let me go on. Go ahead. What you're talking about in terms of this passage of time, there are a number of troubling statements made by the employees. There's no doubt about that. But much of that goes to what you earlier said is really a hostile work environment. But as I said, it's a hostile work environment claim here. Isn't that true? That's true, but this is a very unusual case in that much of the racism or discrimination that was being practiced, Mr. Coselli was not directly aware of it. He was not aware that people were making fun of him and calling him monkey. He was aware of some of it, but he was not aware of how widespread it was. And he certainly wasn't aware that other people had reported this to the higher-ups, including the head of the department. So, you know, I don't think that from what he actually experienced, it would qualify as a hostile work environment. But when you look at all of the other information that was given to management, including the person who made the decision to fire him, I think it's enough. It certainly, to me, is enough to survive summary judgment. Council, this is Judge Nguyen. As to your claim against King County, it's really based on a failure to act by certain individuals in supervisory positions. Is there any indication in the record that any of those individuals have final policy-making authority? Well, certainly Mr. Avery did. I believe Rhodes did, Tom Jones did, and fired him. But you didn't sue Mr. Vestal, did you? I don't believe so. But definitely Tom Jones and who's over Mr. Vestal. I mean, I think the judge's question is pretty important because, frankly, I don't find any evidence that they had any final policy-making authority. Boy, where in the record is there any? Well, the head of the agency at the time was Michael Avery. All right. What about Jones or Avery? Is there evidence that they have policy-making authority? Well, I don't know who else there would be. That's the very top of the agency. When you go after these defendants, you seem to treat King County and all the defendants as one rather than making a direct argument about each defendant. And so we kind of have to parse together what you're really saying. So what evidence is there in the complaint about Shields? Well, I agree Shields was a supervisor. He was at the supervisor level. He was not a person who had policy-making authority. Well, and he really didn't have anything to do with either the first extension, the second extension, or the termination. Well, I won't say he didn't have anything to do with the termination. Well, it isn't alleged. He was supplying information to VESCO about Mr. Caselli's interactions with him. So he didn't have direct authority, but he did have something to do with the discharge. I don't think that if we're going to try to impute liability to King County, I don't think that the people who have to have decision-making authority, if that's how King County makes this decision by taking a look at what other people are saying, what his evaluators are saying about him, and then making a decision as to whether or not he's competent. I see. Let me ask you this then. Again, you're alleging all these against King County and all the defendants as one. What is your claim against Jones? Mr. Jones? Yeah. Well, because Mr. Jones was told on several occasions that discrimination was taking place, specifically discrimination with respect to... Well, let's take the... Well, just a minute. Let's take the first extension. He was one who was involved in the first extension, right? He was the one who was involved after the fair enforcement issue where Mr. Coselli was arrested on the train. Yeah. He was the one who had to make the decision. And he said in that situation that the officers who were on the train were the ones at fault. And that the only reason that your client's conduct was even at issue was that it was not appropriate for what they would expect an officer similar to him would act at the time. Not that he was at fault. Isn't that what Jones found? Well, that's what he found, but how could he make that determination at all? I consider that determination was discriminatory as well because he was not in a position to make such a finding. He had someone else... Didn't he have the evidence to look at, the video? Yeah, but I don't think that that's what he did. He assigned Lemke to do the investigation. And Lemke made a report to him, which in no way indicated that an extension of the RSIT probation was in order. In fact, this is the first time and probably the only time it's ever happened where someone's probation was extended, particularly that early in the employment relationship. I thought that he made the decision to extend probation after he had reviewed all of the evidence that was available to him. Is that not correct? I will not believe that's correct because I don't see how he could have done that. Okay. You have about a four and a half minutes. Would you like to save that for rebuttal? Yes, thank you. Thank you. For King County? Yes, thank you, Your Honor. John Zeldin-Rust on behalf of King County. This was a Section 1981 claim for discrimination and retaliation. The district court properly dismissed the discrimination claim because he failed to present a prima facie case on two elements. He failed to show he was living up to the employer's legitimate expectations, and he failed to show that any similarly situated non-protected employee received more favorable treatment. On the retaliation claim, he did make complaints, which are protected acts. There were adverse actions, but he failed to show a sufficient causal connection between his protected conduct and the adverse actions. What do I do with the evidence in the record that Rhodes may have attempted to cover up an employee's racist remarks and gestures and to falsely report that the plaintiff was the aggressor during the incident? Your Honor, I'm not sure. I think what you might be referring to is some of the hostile work environment information. I don't know that there's any corroboration for those statements. Well, but just a minute. It wasn't this offered as a statement made and offered against Rhodes, therefore not hearsay, and I guess I'm trying to figure out why there would be any objection on foundation because the witness, which was Karen Rispoli, had personal first-hand knowledge of these statements. So therefore, I'm trying to say to myself, if I'm looking at this evidence in the light most favorable to the plaintiff, isn't that enough evidence to raise a tribal issue of fact as to Rhodes' motivation in participating in any decision Rhodes participated in? Well, Your Honor, I don't think so, and the reason is this. First of all, Karen Rispoli is not a speaking agent of the county, and she's not a party. I don't believe that... Well, but just a minute. She doesn't need to be of a county. She's a witness. She had personal first-hand knowledge of what Rhodes had done. Okay, and I believe you're probably speaking of something that occurred in mid to early 2013. There's an allegation of some squabble that happened, and there was a request that something to the effect that, you know, I won't lie for you or something to that effect. I guess the response to that... Frankly, I don't know if that's exactly it. The thing that most got me about it, Rhodes knows about the comments made about the plaintiff, and then he attempts to cover up the employee's complaint with the plaintiff, and instead reports that the plaintiff was the aggressor in the incident, and it also suggests he was rude to another African-American in that operator's interview. So those seem to me, if I construe them in the light most favorable to the plaintiff, at least put together a tribal issue of fact as to his motivation in the decisions he participated in, which, as I understand it, is only the second extension as it relates to discrimination, but it also may relate to that as it relates to the retaliation claim. Well, Your Honor, there's a couple things that I'd like to point out about that, and that is, first of all, in order for there to be a tribal issue of fact on the discrimination or retaliation claims, discrimination has to be a but-for cause of the termination under Comcast. There is no racial component to any allegation that Mr. Rhodes or Mr. Avery might have set. This is an uncorroborated allegation. There's no basic information to indication of racial animus on behalf of Mr. Rhodes. Now, in order for there... Just a moment. The standard you're using would basically be a standard that we look at at trial in terms of credibility. The issue was raised by a witness, and it would seem to me that it flies in the face of the basic summary judgment standard, whether there's a tribal issue of fact. You may be right that this woman is not credible, but we don't know that. The allegation is raised as to a cover-up of these employee racist remarks. Doesn't that, in fact, provide the causal linking on a summary judgment standard? Your Honor, the reason I don't think so is because anything that happened, there's very, very little in the record about this. The thing about it is that, again, I don't believe there is any evidence whatsoever of any racial animus or any retaliatory animus on behalf of the supervisors. And this was not emphasized below to any extent. It was not investigated. It was not corroborated. There is not a racial component to what happened. There may well be things in the record that suggest that Mr. Kwesele may have not gotten along with certain people or may have had disputes in the workplace. Title VII and Section 1981, by analogy, are not civility codes. There does have to be a but-for racial component to the retaliation claim as well as the discrimination claim. Now, unless there is evidence, direct evidence or circumstantial evidence, of a racial animus by Mr. Rhodes in making his decisions in this case, he doesn't create any kind of an issue of fact there. There has to be a nexus to the racial component. I can understand your argument, I guess. I was trying to say, it seems to me, that what these demonstrate is that there is a causal connection. And we're just arguing, as Judge McEwen has suggested, about credibility of the witness who made the statements. And I can't get around them on hearsay, and I can't get around them on foundations. So, you know, I don't think there's a causal connection. I'm worried that that's a problem. If that's your argument, I understand. As I understand it, Mr. Rhodes only had to do with the second extension of probation, correct? That is my understanding, Your Honor. So, as to all other, the termination and the first extension, as to the first extension, it was Jones. And as to the termination, it was Jones and Avery. Yes. Now, let's look at your similarly situated situation. It seems to me that your argument there is that these are all rail supervisors, not probationary employees, wanting to be a rail supervisor. Is that right? That's correct. But if, in fact, this is a probationer who wants to be the rail supervisor, why are these not, at least on summary judgment, giving every benefit of the doubt to the plaintiff, at least similarly, could be argued to be similarly situated? Well, Your Honor, the primary reason is there is a distinction between probationary and permanent. Now, there is a case in the Ninth Circuit that does state this. It was decided in 1999. It was not published. However, it does have a footnote that cites to a number of other authorities and other jurisdictions that do draw this distinction between probationary and permanent. So, really, what you're arguing is that in order to make this point, I've got to rely on a case that is not precedent here and or make new law. Well, Your Honor, yes. There is one case that is not published, and it does cite to a number of other jurisdictions that uphold the rule. And I think that the rationale for the rule is that there is a lot of different procedural protections accorded to permanent as opposed to probationary employees. These are employees who have passed their probation. They have a history. They have a record. They have established themselves to some extent. Disciplinary decisions with respect to permanent employees are much different than with probationary employees who do not have collective bargaining agreement protections. Under the collective bargaining agreement, if there is any kind of an adverse action against a career service individual, there's typically three steps they have under the contract. They can say, you know, I dispute this. They can go up to three levels in management. If they're still dissatisfied with the decision, they can go to arbitration. There may be a number of reasons why that disciplinary process does not go to one another. You make one other argument that none of these, and I'm talking Brown, James, Shield and James, Moore, Watchell, Maciel, had the problems that the petitioner had. I'm having a tough time understanding why the petitioner's problems are worse than Shield and Moore. The petitioner who opened the doors on the wrong side of the train failed to attend the scheduled predisciplinary meeting. The Watchell who opened the doors on the wrong side of the train and failed to immediately report the incident. I'm trying to figure out why that is so different. Well, your honor, there's a couple reasons, and one is those are very clearly defined infractions in the collective bargaining agreement, and they do give the probationary employees some of the benefits accorded to the career service in that respect. There is a mandatory one-day suspension for running an amber light or opening the door on the wrong side of the train. They both received that discipline. These incidences occurred very early in their probationary period, probably in the first two months. There was no further allegations against them of inability to the right-of-way, no problems with failing to abide by your supervisor's directives, and so I think that they're just not anywhere close to the performance issues that Mr. Quisigliu experienced over the course of his 12-month probation. So is your argument primarily the number of infractions that Mr. Quisigliu had versus the Well, I think it's both, your honor. The right-of-way incident was clearly the final straw, and as the district court concluded, that was probably an incident in and of itself sufficient to justify termination. Short of that, I think there were a lot of difficulties in the link control center. That was established by Chief Dunn, who is not tainted in this case. In September of 2013, he made a very interesting quote that is placed in the brief about his concerns that Mr. Quisigliu would not be able to deal with a lot of confusion or problems that might result in the system. He's like an air traffic controller on the ground, and there seemed to be a lot of difficulties in his ability to navigate those situations. Now, Mr. Dunn made the same remark again in December of 2013, indicating I still wouldn't feel safe if John was in the LCC by himself. Gabe Rukeyser, who is another individual, rail supervisor, who indicated that Mr. Quisigliu has a pattern of doing fine when the seas are calm, but collapsing and making poor decisions when things get complicated. So there's a number of individuals who have no taint in this case who certainly contributed to this, and I think that the right-of-way incident was the final straw. As it relates to retaliation, it seems that nobody disputes that the petitioner engaged in a protected activity, that he suffered an adverse employment action. We're really talking about the causal connection between the two. As to the first probation violation, that extension, that was a week after the petitioner had complained to Jones. As to the termination, that was a month after the petitioner filed the EEOC complaint. Those seem to show a causation. As to the second extension, I'm not sure there was anything, but Rhoades' actions might supply a causal connection. So that gets me through the prima facie case. I think you have a legitimate non-retaliatory reason, but when we get to pretext, what are we going to say about Rhoades? Well, Your Honor, the thing about this thing with Rispoli, Karen Rispoli, first of all, I want to also emphasize that the termination letter gave seven reasons for Mr. Quasili's termination. None of that came up, and there is no indication of a racial animus on Mr. Rhoades' behalf. There's no indication of an intent to retaliate because he made complaints. And so that critical factor is missing from the Section 1981 analysis. And I would also emphasize that this was barely touched upon below and that it is uncorroborated, and so I think it should not be given any weight in the process. Now, Mr. Quasili did have some protected activities, and there were some adverse actions that followed them. However, his performance was troublesome all through his doing fine, he makes a complaint, and suddenly he's getting all kinds of infractions and write-ups. This was a continual pattern of performance concerns that were not modified by his complaints. I just don't understand, counsel, why you keep talking about corroboration when we're talking about summary judgment. How does corroboration play in? Well, I think that there is law in the Ninth Circuit that says on summary judgment that, you know, uncorroborated statements are insufficient on summary judgment in order to create an issue of fact. This is a bare allegation. There's not a scintilla of evidence in the record that supports this other than a comment by somebody. Now, there's just nothing here that indicates there's any substantiation to it. And I think the other part of it is that I'd really like to emphasize is, again, this was not a basis for his termination. The bases for his termination were all spelled out, they are all corroborated, and they are all substantiated, and they were never rebutted. And so I believe that certainly they had a legitimate non-retaliatory reason to do what they did. Thank you, Mr. Zeldin-Risp. We've given you a couple extra minutes here. I appreciate your argument. We'll now return to Mr. Parker's rebuttal. Thank you, Your Honor. One of the things I want the court to consider was that Mr. Queselli's probationary period would have ended in February of 2014 had it not been extended. And when he had his incident with fair enforcement, which I consider to have been an act of racial profiling, he wasn't yet... So did Mr. Jones. I mean, Mr. Jones said that the officers did not act appropriately, that they were at fault. But he said, the only reason I'm giving you this extension is because how you reacted thereafter, which, if we look at the record, we know exactly what he did. He did not... I mean, he didn't do what the officers... He didn't try to deal with the officers. He opens the door of a vacant operator component and locks himself in there and won't come out until two deputies come to get him. Now that's the reason he got... That's the reason he got the two-month... He got the extension, and he was saying that's not how we would act under these circumstances. Yes, that could be... That's one possibility. The other possibility is that had he not complained, what would have happened, he would have been disciplined as the other people who opened the train doors on the wrong side of the tracks and who had missed amber lights early on in their employment. This incident happened... But just a minute, those guys who opened the doors failed to attend. They were not suspended, but Wachell was given a suspension. Moore wasn't, but this person was not suspended at all. All he was done was given extra probationary time. That's it for the same kind of conduct. Why the difference? Well, it's not because what you got here... Well, I guess I'm trying to figure out how come it's... How come it's different? It seems to me if he had acted a different way than to run into a vacant operator compartment, lock himself in there, not come out until two deputies would come and haul him off the train, that at that point Jones wouldn't have done anything because he said right in his report, the officers were at fault here. The distinction I'm making is between discipline and extended probation. Extending the probation is what allowed the termination to take place in the first place. But since I only have a little bit of minute amount of time... Let me ask you about that, Mr. Parker. What were the remedies? If at the end of the... Where he was going to get his probation first extended, if they had said, we just can't have somebody who acts in a hot-headed way and locks himself in the train and causes this kind of a disruption on public rail, could they have terminated him then? What kind of protective rights did he have at that point? Well, when you're a probationary employee, I guess you could be terminated, but the issue would then become whether or not played a part because no one else had ever been terminated under similar circumstances. He could have been terminated and that'd be possibly the end of it, but by giving him extra probation time, he had a chance to acquit himself better, didn't he? Which didn't, as it turns out, work out very well for him. But in some ways you portray the extension as negative, but in fact, it gave him an opportunity that might have prevented his being fired. Isn't that true? Well, except for the fact that the longer you stay on probation, the less time you have where you're protected by the union. And that's the argument that they were making that we can't compare Mr. Queselli to other supervisors because the other supervisors were permanent and they're protected by the union. Even though their conduct to me... One of the mentioned was sleeping while you're supposed to be watching LCC. To me, that's just as outrageous as the right-of-way incident because you could have all kinds of crashes happen if the LCC person who's supposed to be monitoring the trains is not paying attention. But there's one more point that I'd like to make before... I know I'm running out of time. There's one more point that I'd like to make with respect to the prima facie case. It seems to me that the Ninth Circuit's summary judgment analysis, because if part of the prima facie case is that the employee has to show that there are other employees who were treated differently because of their race. If that's part of the prima facie case, that would end the analysis because if you have evidence of disparate treatment between yourself and other employees of different races, there's no way that summary evidence and the evidence of pretext is not necessary. Thank you. Go ahead. Unless my colleagues have additional questions, we've extended your time, but I want to see if there's any additional questions. It appears not. I'd like to thank both counsel for your argument. The phone argument worked out quite well. We could hear you, understand you, and appreciate your arguments. The case of Questelli versus King County is submitted. We'll take a short break here while we get the counsel for the next case, United States Department of Justice v. the ACLU to check in.
judges: McKeown, N.R. Smith, Nguyen